UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC WILLIAMS,

      Plaintiff,

v.                                        Case No. 04-71579

MICHAEL WOODARD and                HONORABLE AVERN COHN
RANDY PHARE,

      Defendants.

_____/

**MEMORANDUM AND ORDER**
**GRANTING MOTION FOR NEW TRIAL**

**I.**

**A.**

This is a civil rights case under 42 U.S.C. § 1983 involving claims of excessive force and false arrest. Plaintiff is a 55-year-old resident of the City of Detroit. Defendants are Michigan State Police officers. The case was tried to a jury over four days in November 2005. The jury found in favor of defendants on plaintiff's claims. Now before the Court is plaintiff's motion for a new trial under Fed. R. Civ. P. 59(a) on the grounds the verdict was against the clear weight of the evidence. For the reasons that follow, plaintiff's motion is GRANTED.

**B.**

The essence of plaintiff's claims were that without reason or cause defendants first harassed him and then arrested him, and that in the course of these actions they used excessive force causing serious injuries to his face and right arm.

**II.**

**A.**

**1.**

Under Fed. R. Civ. P. 59(a), a court may grant a motion for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The rule has been construed as encompassing such grounds as a verdict against the clear weight of the evidence, an inconsistent verdict, an excessive award of damages, an error of law during the trial, prejudicial misconduct by the court, opposing counsel, or a juror that deprived the moving party of a fair trial. See ROBERT E. JONES, ET AL., FED. CIVIL TRIALS & EVIDENCE, Ch. 20, ¶¶ 20:100-243 (2001 ed.). See also CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2807 (2d ed. 1995).

> It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions of the type now being considered. Necessarily all formulations are couched in broad and general terms that furnish no unerring litmus for a particular case. On the other hand, the trial judge does not sit to approve miscarriages of justice. The judge's power to set aside the verdict is supported by clear precedent and common law and far from being a denigration or a usurpation of a jury trial, has long been regarded an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in

2

> most cases the judge should accept the findings of the jury, regardless of his own doubts on the matter. Probably all that the judge can do is balance these conflicting principles in the light of the facts of the particular case. If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

Id. at § 2806 (footnotes omitted).

**2.**

Circuit Judge Taft, in an early Sixth Circuit case, Felton v. Spero, 78 F. 576, 581 (6th Cir. 1897), put it this way:

> [T]he motion for new trial is a remedy accorded to a party litigant for the correction by the trial court of injustice done by the verdict of a jury. It is one of the most important rights which a party to a jury has. It is a right to invoke the discretion of the court to decide whether the injustice of the verdict is such that he ought to have an opportunity to take the case before another jury. . . .

More recently, the Sixth Circuit said in Bell v. Johnson, 404 F.3d 997, 1002 (6th Cir. 2005):

> Federal Rule of Civil Procedure 59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a). The Supreme Court has noted that "the authority of trial judges to grant new trials" pursuant to Rule 59(a) "is large." Gasperini v. Ctr. for the Humanities, Inc., 518 U.S. 415, 433, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996); see also id. ("'The trial judge in the federal system,' we have reaffirmed, 'has . . . discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence.'" (quoting Byrd v. Blue Ridge Rural Elec. Corp., Inc., 356 U.S. 525, 540, 78 S. Ct. 893, 2 L. Ed. 2d 953 (1958))).

3

**3.**

There are limitations when, as here, the grounds urged for the new trial is that the jury's verdict was against the clear weight of the evidence.

In J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir. 1991), the Sixth Circuit said:

> One who challenges the weight of the evidence argues that the jury's verdict, although supported by some evidence, is still clearly against the weight of the evidence. Unlike motions for directed verdicts and judgments notwithstanding the verdict, in ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir. 1981). It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable. Id.

In Toth v. Yoder Co., 749 F.2d 1190, 1197 (6th Cir. 1984), the Sixth Circuit expressed it slightly differently when it said:

> In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge may compare the opposing proofs and weigh the evidence and it is the duty of the judge to set aside the verdict and grant a new trial if he is of the opinion that the verdict is against the clear weight of the evidence. Moran v. Johns-Manville Sales Corp., 691 F.2d 811 (6th Cir. 1982); Bruner v. Dunaway, 684 F.2d 422 (6th Cir. 1982). However, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S. Ct. 409, 412, 88 L. Ed. 520 (1944). "Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could

4

reasonably have been reached." <u>Bruner v. Dunaway</u>, 684 F.2d at 425.

### 4.

Accordingly, a motion for a new trial under Fed. R. Civ. P. 59(a), as plaintiff presents here, is subject to a less stringent standard than a motion for judgment as a matter of law under Fed. R. Civ. P. 50.  "These motions have wholly distinct functions and entirely different standards govern their allowance."  WRIGHT, ET AL. at § 2531.

> The contrasts between the two motions are dramatic.  If a motion for a new trial is granted, the case is tried again.  If the motion for judgment as a matter of law is granted, the case is at an end.  Because of the finality that the latter motion has, it is natural that it should be measured by a far more rigorous standard.  On a motion for new trial, the court has a wide discretion to order a new trial whenever prejudicial error has occurred.  On a motion for judgment as a matter of law, it has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue. On a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence.  On a motion for judgment as a matter of law, it may not.

<u>Id</u>. (footnotes omitted).  <u>See</u> <u>also</u> <u>Manley v. Ambase Corp.</u>, 337 F.3d 237, 244-45 (2d Cir. 2003) ("[A] new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and . . . 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" (internal citations omitted)).

### B.

The jury instructions to which the defendants did not take exception stated in part as follows:

### 1.

Plaintiff claims that defendants used excessive force when arresting him.  You are instructed that every person has the right to be free from unreasonable or excessive force while being arrested.  When making a lawful arrest, an officer has the right to use reasonable force.  However, if the arrest is unlawful, any use of force is unreasonable.  Whether or not the force used in making an arrest was unnecessary, unreasonable, or violent, is an issue to be determined by you based on the evidence.

You must consider the degree of force a reasonable and prudent officer would have applied under the circumstances.  If you find that the defendants used reasonable force to effect the arrest, you must find that they did not violate Mr. Williams' constitutional rights to be free from excessive force.  If you find that the defendants used unreasonable force to effect the arrest, you must find that they did violate Mr. Williams' constitutional rights.

* * *

In determining whether excessive force was used you may of course consider the extent of the injuries suffered by the plaintiff.  However, that even if you find that the plaintiff's injuries were minor, a lack of provocation or need to use force would make any use of force excessive under the circumstances.

* * *

A citizen has a right to resist an unlawful arrest.  However, the amount of force a citizen may use to resist an unlawful arrest must be reasonable under the circumstances.

2.

An arrest or detention of a citizen by a police officer is a "seizure" and is governed by the Fourth Amendment of the United States Constitution.  The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusions by the state.  Therefore, even if made with probable cause, the manner or method of an arrest or detention must still be objectively "reasonable."  In determining whether plaintiff's arrest or detention was made in an improper manner, or unreasonably, you should balance the

6

extent of the intrusion upon Mr. Williams' dignitary interest in personal privacy and bodily integrity against the importance of the governmental interests alleged to justify the need for it.

Put another way, you should consider whether the totality of the circumstances justified the particular sort of seizure complained of in this lawsuit. Reasonableness in Fourth Amendment terms depends not only on when a seizure may be made, but also whether it is made and how it is carried out.

In considering this balancing test you should consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted.

**III.**

**A.**

Testifying at trial were:

- Samuel Larkin, a City of Detroit police officer;

- Lynn Moore, a City of Detroit police officer;

- Christine Garrett, a witness to the incident;

- Michael Woodard, a Michigan State Police officer and a defendant;

- Randy Phare, a Michigan State Police officer and a defendant;

- Eric Williams, plaintiff; and

- James Beale, plaintiff's doctor.

**B.**

Exhibits at trial included the activity logs of Larkin and Moore of June 29, 2001, the day of the incident; a sketch of the layout and positions of cars at the Mobil Gas Station at Rosa Parks Boulevard and the Fisher Freeway Service Drive in Detroit, the location of the incident; and medical records. Used in cross-examination were the Incident Reports of the

7

Detroit Police officers and defendants, and interviews with the Detroit Police officers by an investigator for the Michigan State Police.

### C.

The testimony at trial went generally as follows:

On June 29, 2001, around 11:00 p.m., plaintiff drove from his apartment about a block away in his pickup truck to the Mobil Gas Station to purchase some snacks. As he entered the station, Larkin and Moore pulled up behind him in their patrol car with flashing lights rotating. They came up to the plaintiff's truck, which had stopped, and told him he had a defective rear tail light. Larkin and Moore were assigned to casino duty that evening.

Plaintiff identified himself by his name, age and address. He told Larkin and Moore that he had left his drivers license, registration, and proof of insurance back at his apartment. Larkin and Moore said that plaintiff initially did not directly answer their questions. Larkin and Moore told plaintiff to remain in his truck.

Larkin and Moore then went back to their patrol car to verify the information plaintiff gave them. They could not do so because the patrol car's computer was down. Larkin and Moore did not intend to ticket plaintiff. Rather, it was their intention to tell him to walk back to his apartment and pick up his identification documents. While Larkin and Moore were back at their patrol car, defendants Woodard and Phare entered the Mobil Gas Station to fuel up their patrol car. They were on expressway patrol that evening. Michigan State Police do not engage in surface street patrol in the City of Detroit.

Larkin and Moore beckoned to Woodard and Phare and asked them if they could use their computer to verify the information plaintiff gave them because their computer was down. Woodard and Phare told Larkin and Moore they did not have a computer in their

8

patrol car.  Larkin and Moore briefly described to Woodard and Phare their questioning of plaintiff.  Larkin and Moore did not ask Woodard and Phare for any assistance other than the computer inquiry.

While Larkin and Moore were completing their run sheet on the stop of plaintiff, Woodard and Phare went over to the truck where plaintiff was sitting.  What then occurred is a matter of dispute.  Larkin and Moore did not see exactly what happened.  Moore said he was surprised at what did occur because Woodard and Phare were not asked to do anything.  Moore said he heard a commotion, and when he looked over to the truck he saw plaintiff attempting to get out and push one of the State police officers.  He could not identify which one.

Plaintiff said he sat waiting in his truck after talking to Larkin and Moore, and that its driver side door was open.  While he was talking on his cell phone, Woodard and Phare approached him and began aggressively questioning him.  He said that as he got out of the truck Phare pushed him.  He acknowledged saying "you guys are punks."  He said the two State Police officers grabbed his arm, took him to the ground and handcuffed him.  He said he suffered a broken nose and injured his right arm, as well as bruises and abrasions. Plaintiff was taken first to Detroit Receiving Hospital, and then to a police station.  Plaintiff was in custody two and one-half days.  Initially plaintiff was charged with resisting and obstructing and assault.  Eventually all of the charges against plaintiff were dismissed. Plaintiff said he was humiliated and embarrassed by what occurred.

Garrett, an employee of the Mobil Gas Station was walking to work that evening when she saw the encounter between plaintiff, whom she recognized as a customer, and the two State Police officers.  She said she heard plaintiff say something and the two

9

officers' reactions.  She said she saw the two officers take plaintiff from the truck, put him to the ground, and handcuff him.  She said she also saw the plaintiff sprayed with something.  Finally, she said she saw plaintiff placed in the patrol car and driven away.

Woodard and Phare each testified generally to the same sequence of events.  They each said they were not asked by Larkin and Moore for assistance and approached plaintiff on their own volition in an effort to calm things down.  As they approached plaintiff each said they observed that he was upset and did not want to talk to them.  Phare testified particularly as follows:

> **Q.**   You testified that you made contact with Mr. Williams; is that correct?
>
> **A.**   That is correct.
>
> **Q.**   What occurred when you made contact with Mr. Williams?
>
> **A.**    When I made contact with Mr. Williams, he seemed surprised and I don't believe that he knew that I was standing behind him when I first started talking to him.
>
> **Q.**   What gave you the impression that he was surprised?
>
> **A.**   Because as he turned around to look behind him, he asked me where I came from.
>
> **Q.**   Did you say anything in response to that?
>
> **A.**    I introduced myself and asked him if he understood the reason why he was being stopped.
>
> **Q.**   How did you introduce yourself?
>
> *  *  *
>
> **A.**    I introduced myself as Trooper Phare from the Michigan State Police, and I asked him if he understood the reason why he was being stopped.

10

**Q.**  Did he say anything?

**A.**  He said, "Ask them," pointing backwards.

**Q.**  Did you say anything after that?

**A.**  After I asked him if he understood the reason why he was being stopped, I asked him if he had a driver's license on his person.

**Q.**  What was his response?

**A.**  He said, "Ask fucking them."

**Q.**  What happens next?  Did you say anything after that?

\* \* \*

**A.**  I advised him that if he did not have a valid license on his person that he could be arrested for driving without a license.  I further advised him that the Detroit officers were giving him a lot of leeway by not arresting him and just running the name that he had given them.

**Q.**  What happened next?

**A.**  At that point I asked him if he had any warrants out for his arrest.

**Q.**  Did he respond?

**A.**  He gave no response at that time.  He just turned around and attempted to exit the vehicle.

**Q.**  Did you say anything to him when he attempted to exit the vehicle?

**A.**  I advised him that he needed to be [sic] remain inside the vehicle until Detroit was done with their traffic stop.

**Q.**  Why did you advise him that?
**A.**  Due to officer safety reasons and the safety of the people at the gas station as well as your [sic] own.

11

**Q.** So it was your understanding that the stop was still ongoing?

**A.** Yes.

**Q.** What happened next?

**A.** He turned around. He was very agitated at this time. He advised that he wanted to go into the store, into the gas station.

**Q.** What do you mean by agitated?

**A.** He was obviously upset at my questioning. He kept turning around, looking at me, looking at my partner, looking inside his vehicle.

**Q.** What happens next?

**A.** He again states that he is going to go into the gas station.

**Q.** Does he do anything at that point?

**A.** At that point he attempts to get out of the vehicle.

**Q.** What do you mean by attempt? What does he do?

**A.** He turns sideways in his seat so he's facing towards his door. As he's attempting to get out of the vehicle, he places a foot on the ground, called my partner a punk, and came out and pushed me with two hands in the chest.

**Q.** When he pushes you in the chest, had you had any physical contact with him prior to that?

**A.** No, I did not.

**Q.** What happens next?

**A.** As he pushes me, my partner saw that he pushed me, advised him that he was under arrest as he was coming around the vehicle. After he pushed me, he was still offbalance because he was only on one foot. Excuse me. He fell backwards into the car, hit the back of his head on the top of the door jamb as he was falling backwards. Trooper Woodard came around, grabbed

12

his, I believe his right arm, I grabbed his left arm, then at that point Mr. Williams started screaming for help.

**Q.**   What was he screaming?

**A.**   Help me, Rodney King, they are beating me.

**Q.**   What did you do at that point?

**A.**   At that point we pulled Mr. Williams out of the vehicle.  He continued to resist after he was advised by Trooper Woodard that he was under arrest.

**Q.**   How did he resist?

**A.**   He kept straightening out his arms and attempting to go back apparently into his vehicle.

**Q.**   What happens next?

**A.**   At that point with his resisting and everything we are trained to take an individual down to the ground when they are an active resister at that point.  The reason we do that, take them down to the ground, is it's less likely that they will have injury to themselves or to ourselves.   Basically, as three people are struggling, two of us trying to take one person to the ground, we all kind of went down into a big pile on the ground.

**Q.**   Does anything happen after that?

**A.**   As soon as we hit the ground, his hands go up underneath him.  He's screaming police brutality, they are beating me.  He gets his hands up underneath him.  From our leverage point, we cannot remove his hands from underneath him.

**Q.**   How does he get his hands underneath him?

**A.**   As we all fall to the ground, like I say, we all end up in a big pile.  Everyone pretty much hits our knees.  We all go down.  As you fall, from my experience every time I have fallen, it's human nature to go down to my knees and then to try and catch yourself.

**Q.**   Is that what you did in this situation?

**A.**  In that situation as we went to the ground I went to my knees first.  I observed Mr. Williams going down to his knees as we were -- actually as we fell we were going more towards Trooper Woodard, and he was going down on his knees also.

**Q.**  At this time you still have ahold of his arm?

**A.**  As we are falling, yes, I do.

**Q.**  Did you maintain ahold of his arm?

**A.**  As soon as we hit the ground and he had his hands underneath him, at that point I still had two hands.  Then I had to release one hand to move around to the front side of his body to try and gain more leverage.

**Q.**  And how did you try and gain more leverage?

**A.**  As I moved to the front of him, we are trained to put a knee on his shoulder, which should give more leverage, and it's basically like a pain compliance type of technique to get leverage.  So I moved forward, put my left knee on his left shoulder, and attempted to pull his arm out, which I still could not do.

**Q.**  Beyond placing his hands behind his back to cuff him, was there any particular reason why you were trying to get his hands out from underneath him?

**A.**  At the present time I did not know if he had been searched, whether he had any weapons on him.  At that point I knew he was just resisting and he did not want to be arrested for one reason or another.

**Q.**  What happens after that?

**A.**  We had given him a lot of verbal commands basically from the time he came out of the vehicle to the ground to put his hands behind his back.  He would not comply.  At that point my partner, Trooper Woodard, took out his mace and advised him that he needed to put his hands behind his back or he would be maced.

**Q.**  Was he maced?

14

**A.**  Yes, he was.

**Q.**  What happened after that?

**A.**  As soon as the effects of the Freeze Plus P started taking effect, he did release his arms from underneath him and I was able to place the handcuffs on him.

Tr., November 10, 2005 at 35-42.

### IV.

### A.

As stated in the opening paragraph of this decision, the jury found against plaintiff in favor of Woodard and Phare on his claims.  Particularly the jury answered "No" as to the following questions as to Phare and Woodard:

> Did any one of the defendants deny plaintiff his constitutional right to be free from the use of excessive force in his arrest?
>
> Did any one or more of the defendants deny plaintiff his constitutional right to be free from unlawful arrest?

In coming to a conclusion that the "NO" answers were against the clear weight of the evidence at trial and, in the words of Judge Taft, "whether the injustice of the verdict is such that [plaintiff] ought to have the opportunity to take the case before another jury," there are several considerations which inform this decision.

Woodard and Phare's duties that evening called for them to patrol the freeways in Detroit; they had no general police duties on the surface streets of Detroit.  State Police freeway patrols began in Detroit in the summer of 1976 with the establishment of a temporary post downtown because of the reduction in the budget for the Detroit Police Department.  At the time, the introduction of the State Police was well received, and their presence significantly improved freeway security.

15

Woodard and Phare were in the Mobil Gas Station that evening to gas up their patrol car.  The only thing asked of them by Larkin and Moore was for the use of a computer.  Once they told Larkin and Moore they did not have a computer in their patrol car, they should have had no further involvement in the traffic stop.

In going over to plaintiff's truck and questioning him they gratuitously intervened in a police action of which they were not a part.  They had no good reason for asking plaintiff anything, including even his name.

The questions asked by Phare as related above were in the circumstances of a traffic stop and in the particular circumstance of a motorist displaying annoyance and frustration while waiting for the police officer who made the stop deciding whether or not to write a ticket provocative.  There was no reason or need for Phare to say

> I advised him that if he did not have a valid license on his person that he could be arrested for driving without a license. I further advised him that the Detroit officers were giving him a lot of leniency by not arresting him and just running the name that he had given them.

Plaintiff did not ask Phare what could happen to him.  Phare, at the time, did not know what Larkin and Moore were going to do.  The likelihood of Larkin and Moore arresting plaintiff was highly remote.

Phare abused his authority as a police officer when he said to plaintiff

> I advised him that he needed to be [sic] remain inside the vehicle until Detroit was done with their traffic stop.

Phare was not asked to secure plaintiff.  Phare had no right to prevent plaintiff from leaving his vehicle.  Phare obviously was so close to plaintiff as to physically impede his ability to leave his truck.

16

Phare's account of what occurred next does not make clear whether, as soon as Woodard saw plaintiff push Phare, he told plaintiff he was under arrest, which would have been an overreaction; or, whether Woodard advised plaintiff after he fell backward onto the truck and hit the back of his head that he was under arrest.  In any event, there appears to have been an overreaching by Phare and Woodard because, as Phare described it, Woodard came around, grabbed plaintiff's right arm and Phare grabbed his left arm.  That a struggle was the result was inevitable under the circumstances.

**B.**

Phare and Woodard created a situation in which their own actions brought use of force into play.  The jury was told that a person has a right to be free from unreasonable or excessive force, and that a citizen has the right to resist an unlawful arrest.

Considering whether the arrest was lawful or not lawful and then looking at the force used to effectuate the arrest, it cannot be said for certain that plaintiff should prevail on both of his claims.  In considering a motion for new trial, it is not necessary to find that plaintiff was entitled to the jury's verdict.  What can be said here is that, on the record before the jury, the finding that the arrest was not unlawful and that the force used to effectuate it was not excessive is against the clear weight of the evidence.  Plaintiff should have the opportunity to present his case to a second jury.  As stated by Wright, et al., <u>supra</u>,

> If after giving full respect to the jury's findings the judge on the entire evidence is left with a definite and firm conviction that a mistake has been committed, it is expected that he will grant a new trial.

WRIGHT, ET AL. at § 2806.

The Court has a definite and firm conviction that the jury made a mistake in this

case; it is for that reason plaintiff is entitled to a new trial.

A status conference is scheduled for **Monday, February 06, 2006 at 2:00 p.m.** to set

a date for the retrial.

SO ORDERED.


Dated:  January 18, 2006                     s/Avern Cohn
                                             AVERN COHN
                                             UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this
date, January 18, 2006, by electronic and/or ordinary mail.

                                             s/Julie Owens
                                             Case Manager
                                             (313) 234-5160

S:\OPINIONS\January 2006\Williams.New Trial Order.wpd